# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

JESSICA L. WISER,                              :

     Plaintiff,                          :
                                       Case No. 3:13cv00421

 vs.                                          :

                                        District Judge Thomas M. Rose

CAROLYN W. COLVIN,                             :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                       :

     Defendant.                          :

## REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Jessica L. Wiser brings this action under 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  Plaintiff protectively filed her application on January 20, 2010, alleging that she has been disabled since September 30, 2006.[2]  (*PageID##* 189-92).  She claims to be disabled due to Bipolar Disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), Posttraumatic Stress Disorder ("PTSD"), and Oppositional Defiant Disorder ("ODD").  (*PageID#* 204).  After her application was

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2]Under the controlling regulations, a Plaintiff cannot receive benefits for any period prior to the filing of his application for SSI benefits. 20 C.F.R. § 416.335.  SSI benefits cannot be awarded retroactively. SSR 83-20, 1983 WL 31249, at *1, *7 (1983).

denied during the initial administrative proceedings, Plaintiff was provided a hearing

before an Administrative Law Judge ("ALJ").  On August 29, 2012, ALJ Mary F.

Withum issued a decision concluding that Plaintiff was not under a "disability" within the

meaning of the Social Security Act, and therefore was not eligible for SSI.  (*PageID##*

38-50).  The ALJ's decision and the resulting denial of benefits became the final decision

of the Social Security Administration.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the

Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12),

the administrative record (Doc. # 6), and the record as a whole.

## II.  **Background**

### A.  **Plaintiff's Vocational Profile and Testimony**

Plaintiff was 21 years old at the time she filed her application for benefits.  Thus,

she is a "younger individual" for purposes of resolving her SSI claim.  *See* 20 C.F.R. §

416.963(c); *see also PageID##* 49, 199.  Plaintiff has a high school education,[3] *see* 20

C.F.R. § 416.964(b)(4); *see also PageID##* 72, 205, and no past relevant work

experience.  (*PageID##* 49, 206).

Plaintiff testified at the administrative hearing held on June 21, 2012, that she just

started working at Goodwill Industries.  She sorts shoes for 6 hours per week and has

been working there for two weeks.  (*PageID#* 67).  She works with five other kids while

_____

[3] Plaintiff finished her high school education by home schooling after she was having difficulties at school from being picked on because of her interest in anime and not fitting in well with fellow marching band members.  (*PageID#* 94-95).

2

sorting shoes.  (*PageID#* 82).  They get paid by the number of shoes they sort, and work

for 45 minutes at time, with a 15 minute break in between, and a 45 minute break for

lunch.  (*Id.*).  She takes public transportation (a bus) to get to and from work.  (*PageID#*

68).  She volunteers at The Society for the Improvement of Conditions of Stray Animals

("SICSA") and Chums, and spends time at "We Care Arts," a painting center.  (*Id.*).  She

testified she has been volunteering at SICSA for six years, but only recently began going

to We Care Arts and Chums.  (*Id.*).  Her volunteer work includes stuffing envelopes,

walking dogs, and cleaning animal cages.  (*Id.*).  She paints pictures and pieces of wood

at We Care Arts.  (*PageID#* 90).  She goes to We Care Arts from 1:00 to 4:00 on Fridays,

and to Chums once a month.  (*PageID#* 91).  She only spends one to two hours per week

volunteering, "because [she has a] very tight schedule[] and [she] need[s] to rest."

(*PageID#* 69).  Plaintiff stated her work at Goodwill "leaves me very exhausted."  (*Id.*).

Plaintiff previously worked at a pretzel place in the mall for four days.  (*PageID#*

82).  She made pretzels and drinks, but was let go because "some of me and the ladies

were playing around and they were just saying something and I added the word, 'Shut

up.'  And they must've taken it the wrong way and then I mistook one of the leader's

words and didn't put salt on one of the trays and they got angry with me.  And the next

day they said, 'We're going to have to let you go.'" (*PageID#* 83). Plaintiff also worked

at a large home improvement store for about 1 ½ months but was "let go" because she

"was hiding from customers, not doing my job, and so called 'making weapons.'"

(*PageID#* 84).  She explained "making weapons," meant that she was whittling sharp

3

points on the end of discarded dowel rods.  (*Id.*).  She stated she made these for

"[p]rotection in the morning because it was very, very dark when I'd get up."  (*Id.*).

Plaintiff has a driver's license but testified she does not drive.  (*Id.*).  She used to

drive, but stated that she "had some mishaps that my mother and [step]father will not let

me drive anymore."  (*PageID#* 70).  For example, she accidentally left the car in gear and

it rolled over her father's foot, breaking a couple of his toes.  (*Id.*).

Plaintiff stated she lives with her mother and stepfather.  (*PageID#* 71).  She has

not seen her biological father since she was 18.  (*PageID#* 75).  She stated her mother

works at night and her stepfather is a contractor and works all day.  (*PageID#* 71).

Plaintiff graduated high school and took some college classes.  (*PageID#* 72).  She

testified she was no longer taking classes, "because the classes are so expensive, and so

are the books."  (*Id.*).  She stated she took Intro to English, Student Success, Biology,

Chemistry, and "tried to take Psychology," however, she "couldn't manage that."  (*Id.*).

She received B's in Intro to English and Student Success; managed an A in the "hands-on

portion" of her Chemistry class but "did not fare so well" on the written portion; and got a

C in Biology.  (*Id.*).  She hopes to take more classes in the future.

Plaintiff stated a typical day consists of the following:

> Well, one day is I'll wake up at 5:00, wash, brush, dress, get on my bike, head up
> to the Hub, South Hub bus stop, get on Bus 19, ride it down to the bus stop in front
> of Kroger's, wait for 18, ride that downtown, and then up to Goodwill.  I work at
> Goodwill.  Catch the 18 back to the Downtown Hub, sit there and wait for the
> others, catch that back up to the 19, and then back to the South Hub.  Bike home,
> do my chores, and then I have a free day.  And in a normal, normal day, I will get
> up at 9:00, have my breakfast and look at the job board, see what I have to do.  If I

4

have any time to do it, sometimes I don't do what I'm supposed to.  I'll start doing my chores.  And then if I hear barking from the back room, I'll go get [my dog] to take him out.

(*PageID#* 73).  Plaintiff testified she has four dogs: "[t]wo big ones, two little ones."

(*Id.*).  She also does chores around the house, such as cleaning up the living room, cleaning up her room, cleaning the bathroom, cleaning the kitchen, cleaning the laundry room, doing laundry, doing dishes, and keeping the entertainment center clean.  (*PageID#* 73-74).  For breakfast, Plaintiff makes a bowl of cereal.  (*PageID#* 74).  She is able to make food in the microwave, such as noodles or corn dogs.  (*Id.*).  She testified she does not believe she could live on her own because, "my budgeting is horrible" and her house would be "very, very messy."  (*Id.*).  She stated while she knows how to do all the chores at home, it takes "a lot of prompting from my parents."  (*PageID#* 75).

Plaintiff also stated that her mother "does basically everything for me.  She takes my money, budgets it, gives me $5 a day out of my pay so I can get my lunch for Goodwill."  (*PageID#* 77).  Plaintiff stated she has been on medications since she was three years old.  (*PageID#* 78).  There was one time when she stopped taking her medications for a month because she was living with her biological father at the time and he would not buy her medication for her, and she became "very, very messed up."  (*Id.*).  After she restarted her medications, "about three weeks later, I was okay."  (*Id.*).

When cross-examined by her counsel, Plaintiff testified she has trouble finishing tasks at home because of TV and "something interesting on the computer."  (*PageID#* 85).  Her mother sets out her medications each day, and calls to remind her to take them

one or twice a day.  (*PageID#* 85-86).  She testified she also needs to be reminded to take a bath, change her clothes, and brush her teeth.  (*PageID#* 87).  She goes to bed at 9:00 p.m. and wakes up at 9:00 a.m.  (*Id.*).  When she goes to Goodwill, she goes to bed at 6:00 p.m. the night before and wakes up at 5:00 a.m.  (*Id.*).  Plaintiff testified she can only concentrate for 15 minutes at a time.  (*PageID#* 88).  She stated she has trouble interacting with men because her grandfather, as he aged and became ill, "became meaner and meaner.  And he yelled at me a lot."  (*Id.*).

### B.  **Medical Evidence**

The administrative record contains many medical records plus opinions from Plaintiff's treating and non-treating medical sources.  A detailed description of those records and opinions is unnecessary because the undersigned has reviewed the entire administrative record and because both the ALJ and Plaintiff's counsel have accurately summarized the relevant records concerning Plaintiff's physical and mental impairments with citations to specific evidence.  The Commissioner likewise defers to the ALJ's factual recitation.

## III.  **Administrative Review**

### A.  **"Disability" Defined**

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements.  Chief among these, for purposes of this case, is the "disability" requirement.  To receive SSI, an applicant must be a "disabled individual." 42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986).  The phrase

"disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  42 U.S.C. §1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70. An SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

   **B.**     **Social Security Regulations**

   Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See PageID##* 41-43; *see also* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

   1.     Is the claimant engaged in substantial gainful activity?

   2.     Does the claimant suffer from one or more severe impairments?

   3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. 404 Subpart P, Appendix 1?

   4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

   5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

7

F.3d 348, 354 (6th Cir. 2001).

    **C.**     <u>**ALJ Withum's Decision**</u>

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since January 20, 2010, the application date. (*PageID#* 43).

At Step 2 of the sequential evaluation, ALJ Withum concluded that Plaintiff has the severe impairments of asthma, bipolar disorder, PTSD, and ADHD. (*Id.*). ALJ Withum found that Plaintiff's alleged ODD is a non-severe impairment. (*Id.*).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the Listings, including sections 12.04 and 12.06. (*PageID##* 43-45).

At Step 4, the ALJ found that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except low-stress, requiring only 1-3 step tasks, decisionmaking, changes in the work setting, and coworker interaction, with no fast-paced production work or public interaction." (*PageID#* 45).

ALJ Withum further determined that Plaintiff has no past relevant work. (*PageID#* 49).

At Step 5, based on the testimony of the VE, the ALJ concluded that – considering Plaintiff's age, education, work experience, and RFC – she is able to perform the requirements of occupations such as hand packaging (unskilled, 5,000 jobs regionally and 630,000 jobs nationally), machine packager (unskilled, 3,000 jobs regionally and 375,000

jobs nationally), and warehouse worker (unskilled, 14,000 jobs regionally and 243,000 jobs nationally). (*PageID#* 49).

This assessment, along with the ALJ's findings throughout her sequential evaluation, led her to ultimately conclude that Plaintiff was not under a disability and hence not eligible for SSI. (*PageID#* 50).

## IV.   **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal

criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.     Discussion**

Plaintiff first argues that the ALJ erred by failing to properly apply the treating physician rule to the opinion of her treating psychiatrist, Dr. Katherine Hott, M.D. (*PageID#* 473-79). The Commissioner contends the ALJ gave "good reasons" for not providing Dr. Hott's opinion controlling weight and, instead, giving it little weight. (Doc. #11, *PageID#* 491). Specifically, the Commissioner agues the ALJ "reasonably determined that many of Plaintiff's activities were inconsistent with Dr. Hott's conclusions that Plaintiff had marked limitations in her ability to understand and remember, maintain concentration, persistence, or pace, functional socially, and adapt to changes in the workplace. (Tr. 18, 350-52)." (*Id.*).

Social security regulations recognize several different categories of medical sources: treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians. *Gayheart v. Comm'r Social Sec*., 710 F.3d 365, 375 (6th

10

Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (d) (eff. April 1, 2012)).

A treating source's opinion may be given controlling weight under the treating physician rule only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Gayheart*, 710 F.3d at 376; *see* 20 C.F.R. §404.1527(d)(2) (eff. April 1, 2011). "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6) (eff. April 1, 2012)).

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization,

11

consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id*. (citing 20 C.F.R. §404.1527(c)(6) (eff. April 1, 2012)).

Turning to Dr. Hott's opinion, she first began treating Plaintiff on July 19, 2003. (*PageID#* 324).  She completed a questionnaire on behalf of the Ohio Bureau of Disability Determination ("BDD") on May 5, 2010, in which she indicated that Plaintiff has experienced severe bipolar disorder since at least age 12.  (*PageID#* 325).  Dr. Hott noted that Plaintiff "has labile mood ranging from hypomanic to moderately depressed." (*PageID#* 325).  She found Plaintiff is easily overwhelmed by any anxiety or external pressure.  (*Id.*).  Dr. Hott noted that Plaintiff's symptoms have gone into partial remission, but minor stressors can cause depressive cycles.  Dr. Hott also believed that Plaintiff's bipolar disorder has been sufficiently severe such that it has delayed her psychological development.  (*PageID#* 327).  She believes Plaintiff functions at an elementary school level, has little judgment to manage her life, requires supervision by her mother, and "has been unable to work even in a simple janitorial role."  (*Id.*).  Dr. Hott provided a statement under oath to Plaintiff's counsel on May 17, 2011.  (*PageID#* 337-383).  She did not believe Plaintiff could sustain full-time gainful employment at any level in the economy, due to her "lack of persistence and easy frustration, tolerance, [and being] very sensitive to possible criticism of any kind, that kind of thing."  (*PageID#* 382).

ALJ Withum gave "little weight" to Dr. Hott's statements, finding as follows:

12

> The undersigned gives little weight to the medical source statements of Katherine Hott, M.D., opining the claimant cannot sustain full-time gainful employment and experiences marked limitations in her ability to understand and remember, maintain concentration, persistence, or pace, socially function, and adapt to changes in the workplace.  Exhibit 7F and Exhibit 8F.  Her opinions are given little weight because the record does not support it.  As mentioned earlier, the claimant reported she writes stories and plays videogames.  Moreover, she has indicated she befriended classmates and that she attended college.  Exhibit 10F, page 26.  The findings of a July 2010 mental status exam revealed the claimant could perform simple, straight forward math tasks.  Exhibit 6F.

(*PageID#* 48-49).

A review of the record indicates the ALJ's decision to assign "little weight" to Dr. Hott's opinion is not supported by substantial evidence.  Rather, the ALJ's rejection of Dr. Hott's opinion is merely based upon the ALJ's selective review of the evidence.  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984).  An "ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning."  *Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The same treatment notes to which the ALJ cites for finding that Plaintiff's mood improved and was able to take some college courses, also include Dr. Hott's objective findings and clinical observations of Plaintiff, which consistently indicate she experiences mood lability, ranging from hypomania to moderate depression; feels overwhelmed by

13

any anxiety or external pressure; and presents as saddened and fatigued.  (*PageID##* 327,

442, 444).  In April 2011, Dr. Hott even noted that Plaintiff "[h]ad a dissociative -

psychotic experience where she thought she saw a [female] protective ghost."  (*PageID#*

432).  At that time, Plaintiff "told the female ghost 'to cross over' (leave) because 'I'm

not a baby' 'Could sleep on my own' - did not need mother[.]" (*Id.*).  Dr. Hott noted

Plaintiff "was becoming hypomanic for ~ 1 wk, now beginning to get depressed. . . ."

(*PageID#* 432).

Dr. Hott's treatment notes include repeated assessments of Plaintiff's anxiety,

depression, fatigue, mood swings, social withdrawal, and difficulty coping with stress.

(*PageID#* 419-61).  When mental work abilities are at issue, such symptoms constitute

supporting medical or objective evidence.  As the United States Court of Appeals for the

Sixth Circuit has explained:

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices . . . in order to obtain objective clinical manifestations of mental illness . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology.  The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*,

817 F.2d 865, 873-74, 260 U.S. App. D.C. 142 (D.C. Cir. 1987)(other citation omitted).

In addition, Dr. Hott's notes also detail modifications she made to Plaintiff's medication

resulting from each session.  (*Id.*).  While the ALJ selectively focused only on those

14

occasional periods of time in Dr. Hott's notes when Plaintiff had an improved mood or was able to attend school, the ALJ disregarded numerous clinical findings, observations, and diagnoses supporting Dr. Hott's opinion that Plaintiff's symptoms are of Listing level severity. *See PageID##* 419-61.

In addition, in rejecting Plaintiff's treating psychiatrist, the ALJ gave "little weight" to the opinion of consulting psychologist, Dr. Mary Ann Jones, Ph.D., who determined that Plaintiff cannot live independently due to minimal-marginal information, judgment, and common sense reasoning. (*PageID#* 48).
The ALJ determined that the objective evidence of record fails to support Dr. Jones's opinion. (*PageID#* 48). However, there is no indication in the ALJ's decision that she applied the factors described in the regulations to Dr. Jones's opinion.

The ALJ further determined that the RFC "conclusions reached by the physicians employed by the State Disability Determination Services, also supported a finding of 'not disabled.'" (*Id.*). The ALJ erred by not evaluating the opinions of state agency psychologists Karla Voyten, Ph.D., and Frank Orosz, Ph.D., under the required legal criteria. *See PageID#* 48. The ALJ thus failed to comply with the Commissioner's Regulations, which required the ALJ to evaluate the opinions of non-treating medical experts, under the same regulatory factors – supportability, consistency, specialization, etc. – that apply to treating medical source opinions. *See* Soc. Soc. Ruling 96-6p, 1996 WL 374180 at *2-*3 (interpreting, in part, 20 C.F.R. §416.927(e)). Unlike Dr. Hott, who treated Plaintiff closely for many years, Drs. Voyten and Orosz based their RFC findings

on nothing more than the paper file and offered no explanation for the limitations they

established beyond a mere recitation of Plaintiff's impairments. (*PageID##* 106-23).

Furthermore, in light of the dates of the reports of Drs. Voyten and Orosz,[4] the

record is devoid of any medical source opinion contrary to Dr. Hott's opinions after

January 20, 2011. Consequently, the diagnoses and assessments made by Dr. Hott after

January 20, 2011 are uncontradicted by other medical source opinion. Thus, rather than

relying upon a medical source as the basis of her findings, the ALJ injected her own lay

opinion about the significance of Plaintiff's symptoms of psychiatric disorders identified

in Dr. Hott's records. However, "an ALJ must not substitute his own judgment for a

physician's opinion without relying on other evidence or authority in the record."

*Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see also Meece v. Barnhart*, 192 F.

App'x 456, 465 (6th Cir. 2006) (finding "the ALJ may not substitute his own medical

judgment for that of the treating physician where the opinion of the treating physician is

supported by the medical evidence."). Moreover, the Sixth Circuit has made clear, where

the ALJ has failed to weigh a treating physician's opinion in accordance with SSA

regulations, the Court cannot excuse the failure even though there may be sufficient

evidence in the record supporting the ALJ's decision. *Wilson*, 378 F.3d at 546. Likewise,

the ALJ's failure to accord proper weight here to Plaintiff's treating physicians is more

---

[4]The State's non-examining psychologists completed their reports on July 29, 2010 and January 20, 2011. The record contains no written opinions on behalf of the State contesting Dr. Hott's opinions, clinical findings, diagnoses, or assessments after January 20, 2011.

than a *de minimis* procedural violation or a "harmless error," and therefore constitutes a sufficient ground for reversal. *See Blakley*, 581 F.3d at 409; *Wilson*, 378 F.3d at 547.

Accordingly, the Court finds that the ALJ failed to follow the treating physician rule in assessing Dr. Hott's opinions, and that the ALJ's non-disability finding must be reversed on this basis.

Plaintiff also asserts that the record dictates a finding she is disabled at Step 3, i.e., that she met or medically equaled Listed Impairment 12.04 for disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04.

An ALJ considers the paragraph B criteria in which the mental impairments of a Plaintiff must result in at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. The ALJ's general reasoning for concluding Plaintiff failed to meet the requirements of paragraph B is that Plaintiff's limitations are moderate rather than marked. This reasoning, however, lacks support and fails to consider a totality of the evidence in the record. (*PageID#* 44).

The ALJ found that Plaintiff only had moderate limitations in her ability to perform daily activities because she was able to perform a range of activities. (*PageID#* 44). A more serious degree of limitation, however, is documented by Plaintiff's non-independent level of functioning. (*PageID#* 85-89, 333). When Plaintiff feels any stress,

she stated she usually, "shrinks into myself and try not to notice it." (*Id.*). Plaintiff testified at the hearing that she withdraws from people and becomes less communicative when she feels stress. (*Id.*). In a stressful work environment, she merely breaks down. (*PageID#* 89). During the consultive evaluation, Dr. Jones noted that Plaintiff's attention needed constant refocusing. (*PageID#* 330). Dr. Jones also noted that Plaintiff displayed delusional thinking and exhibited a degree of paranoid ideation. (*PageID#* 331). Dr. Hott also described Plaintiff as having panic attacks which she indicated is a "form of anxiety disorder, and the essential features of it are that it develops very quickly within 2-3 minutes. It peaks out fast. It doesn't usually last very long, but it is terrifying." (*PageID#* 348). Even though Plaintiff's reaction to stress may not meet the regulatory definition of decompensation, the record indicates it certainly impedes her from performing her daily activities, and thus meets the requirement for paragraph B1.

Furthermore, while the ALJ concludes that Plaintiff socially withdraws around others, she nonetheless finds that Plaintiff only has a moderate limitation of social functioning because she socializes during work with her coworkers. (*PageID#* 44). Both Dr. Hott and consultive psychologist, Dr. Jones, found Plaintiff has difficulty interacting independently, appropriately, and effectively with others; these conclusions are precisely the definition of a marked limitation of social functioning. (*PageID##* 329-31, 345-46, 348).

The ALJ also finds Plaintiff experiences only moderate limitation in regard to her concentration, persistence, or pace. The ALJ indicates that because she plays video

games and writes stories, there is ample evidence that Plaintiff only has a moderate limitation in her concentration, persistence, and pace.  (*PageID#* 44).  However, the ALJ failed to account that it took seven years for Plaintiff to complete high school and that her enrollment in college classes could only be accomplished by taking one class at a time. (*PageID#* 353).  Dr. Hott also indicated, "she can't pay attention and remember." (*PageID#* 372).  While Plaintiff testified she did well in some classes, it was noted by Dr. Hott that Plaintiff failed 2 of 3 courses at Sinclair because she did not read e-mails about homework assignments, and she finds school "tedious," preferring to spend time writing fantasy stories.  (*PageID#* 452).  Nonetheless, the ALJ attempts to highlight certain portions of the record in such a way that minimizes Plaintiff's impairments.  Yet doing so ignores the simple fact that Plaintiff cannot sustain focused attention and concentration and independently, appropriately, and effectively complete tasks.  Therefore, Plaintiff does meet the criteria under paragraph B of Section 12.04.

In addition, Plaintiff also meets the criteria of the listings under paragraph C of Section 12.04 because the evidence of record shows a medically documented history of a chronic affective disorder of at least 2 years' duration which has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support.  Further, there exists a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  Nevertheless, the ALJ

relied instead on the conclusions of two psychologists, Drs. Voyten and Orosz, who failed to even examine Plaintiff.  Once again, the ALJ merely used whatever minimal contrary evidence was available in the record to support her incorrect conclusions.

Accordingly, the Commissioner's decision that Plaintiff is not disabled is not supported by substantial evidence in the record as a whole and should be reversed.

## VI.  Award of Benefits is Warranted

If the ALJ failed to apply the correct legal standards or her factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

An Order remanding for payment of benefits is only warranted "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.  A judicial award of benefits is warranted in the present case because the evidence supporting the existence of Plaintiff's disability is strong while contrary evidence is lacking.  The strong evidence consists of the opinion provided by Dr. Hott, as well as evidence contained in the longitudinal medical record.

As the proof of disability in this case is great, remand will serve no purpose other than delay.  In this case, all substantial factual issues have been resolved, the opposing evidence is severely lacking in substance, and the record reflects that Plaintiff is disabled and has been disabled since January 20, 2010.  *See Faucher*, 17 F.3d at 176. In light of the medical evidence, including the extensively detailed opinion and notes from Plaintiff's treating psychiatrist, proof of disability is overwhelming.

### IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      Plaintiff's case be **REMANDED** to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for payment of SSI consistent with the Social Security Act; and

3.      The case be terminated on the docket of this Court.

February 10, 2015

     s/Sharon L. Ovington     
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).